# COMMONWEALTH OF VIRGINIA

NORFOLK CIRCUIT COURT
Civil Division
150 ST. PAUL'S BLVD 7TH FLOOR
NORFOLK VA 23510
(757) 389-8942

Summons

To: CORPORATION SERVICE COMPANY
RESIDENT AGENT
100 SHOCKOE SLIP, FLOOR 2
RICHMOND VA 23219

Case No. 710CL25006738-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Monday, August 04, 2025

Clerk of Court: GEORGE E. SCHAEFER III

by ______________________________
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:

EXHIBIT
1

VIRGINIA

IN THE CIRCUIT COURT OF NORFOLK CITY

**ROCIO DA SILVA,**

*Plaintiff,*

v.

**DAVID FERRARA**
**6100 Fox Cantor Court,**
**Moseley, Virginia 23120**

*and*

**AB FACILITY SERVICES, LLC,**
**300-1 State Route 17 S, Suite 4**
**Lodi, N.J. 07644,**

**Serve resident agent:**

**Corporation Service Company,**
**100 Shockoe Slip 2nd Floor,**
**Richmond, VA, 23219,**

*Defendant.*

**Case No.** CL25-6738

FILED
AUG 04 2025
NORFOLK CIRCUIT COURT CLERK
BY______ D.C.

**CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF**
**AND DEMAND FOR JURY TRIAL**

Plaintiff Rocio Da Silva, by and through counsel, files this civil complaint and jury demand against Defendant AB Facility Services, LLC. ("ABFS") and David Ferrara, jointly and severally. Da Silva seeks damages and equitable relief against Defendant ABFS for violations of the Virginia Human Rights Act, Va. Code Ann. § 2.2- 3900 *et seq*. (as amended by the Virginia Values Act), the Virginia Whistleblower Protection Law, Va. Code § 40.1-27.3, negligent hiring, and negligent retention. Da Silva seeks damages and equitable relief against all Defendants for

common law intentional infliction of emotional distress and for common law wrongful discharge in violation of public policy. Da Silva seeks damages and equitable relief against Defendant David Ferrara for common law defamation.

**Jurisdiction and Venue**

1. This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in Norfolk, VA and maintain regular and systematic contacts with Norfolk, VA.

2. This Court has jurisdiction over the claims in this complaint brought under the law of the Commonwealth of Virginia pursuant to the Virginia Human Rights Act, the Virginia Whistleblower Protection Law, and the common law of Virginia.

3. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims herein occurred in Norfolk, VA.

**Administrative Exhaustion**

4. On November 8, 2024, Da Silva timely filed a complaint with the Virginia Office of the Attorney General – Office of Civil Rights (OAG-OCR).

5. On December 2, 2024, The OAG-OCR forwarded Da Silva's complaint to the U.S. Equal Employment Opportunity Commission, Norfolk Local Office ("EEOC"), for further review and consideration.

6. The EEOC issued Da Silva a notice of right to file a civil action on May 16, 2025.

7. This matter was timely filed within 90 days of May 16, 2025.

**Parties**

8. Plaintiff Rocio Da Silva is a resident of Virginia, is a former employee of ABFS and former colleague of David Ferrara.

9. Defendant ABFS is a New Jersey corporation headquartered in New Jersey, with offices in, among other places, Norfolk, VA.

10. Defendant Ferrara is a Virginia resident, a former employee of ABFS and former colleague of Rocio Da Silva.

**Factual Allegations**

11. ABFS provides facility maintenance services, such as engineering services, mechanical services, and custodial services, to the commercial and residential sectors.

12. ABFS hired Da Silva in or around June 2019 as a regional manager.

13. ABFS promoted Da Silva to director of operations by August 2019 but without any increase in pay. Da Silva oversaw all custodial operations in the mid-Atlantic region as director of operations, and she developed ABFS's DC and Norfolk, VA offices from their inception by hiring and managing dozens of employees.

14. Da Silva largely divided her time between managing the DC office and the Norfolk office.

15. Da Silva noticed that she was the only female director out of nine directors at ABFS, and she Da Silva learned through the course of her work that the eight male directors at ABFS earned more than her despite having the same duties and responsibilities, performing the same level of work, and holding the same rank in ABFS's organizational chart.

16. Da Silva's initial supervisor was Mark Quigley, executive director of operations, but he rarely traveled from New Jersey and had little direct oversight of Da Silva or the DC and Norfolk offices.

17. Da Silva performed well at ABFS. In so doing, she brought in new clients and revenue for ABFS throughout her tenure, totaling nearly $17 million in contracts. Two

significant contracts were with Stoladi Property Management for $5 million as well as a 5-year custodial contract with the City of Norfolk for $12 million which began in 2023.

18. Da Silva managed both custodial and mechanical operations for ABFS in her region until December of 2022, when ABFS hired David Ferrara to run mechanical operations for ABFS.

19. ABFS issued Ferrara the title of senior director of mechanical operations and a higher salary than Da Silva even though he had the same duties and responsibilities that she did when she ran mechanical operations. Da Silva and Ferrara also reported to the same supervisor, Quigley.

20. Da Silva's female peers in the buildings management industry and ABFS warned Da Silva to be wary of Ferrara, claiming that he assaulted a female colleague at another employer, resulting in civil damages.

21. Da Silva had also learned from Jeff Jansen, vice president of mechanical operations for ABFS's competitor, UG2, that the company had almost hired Ferrara, but that a background check had made the company reconsider.

22. Da Silva disclosed the foregoing issues with Ferrara to ABFS's owner Phil Caprio, but Caprio opted to hire Ferrara anyway, telling Da Silva that the issue in the background check had been "insignificant." Upon information and belief, ABFS did not conduct a background check and Caprio had simply asked Ferrara without any further inquiry, as ABFS does not typically wish to pay for background checks.

23. Ferrara was dismissive towards Da Silva and her female colleagues in 2022 and 2023, and he did not seriously consider their input.

24. ABFS executive advisor Robert DiGia became Da Silva's *de facto* supervisor in

or around January 2023, as Quigley did not directly manage ABFS's directors in DC and Norfolk at the time.

25. DiGia micromanaged Da Silva over the course of 2023 and assigned her clerical tasks. DiGia also routinely gave Da Silva negative and harsh feedback over minor issues. For example, De Silva improved ABFS operations by introducing a common digital storage solution to ABFS in 2023, but DiGia still harshly criticized Da Silva because of his inability to adapt to the new technology involved.

26. Da Silva noted that DiGia treated her worse than DiGia's male reports, and DiGia frequently derided Da Silva to the point of tears in front of male colleagues and Caprio, who never spoke out in Da Silva's defense. DiGia also made the comment that "pretty women make good salespeople."

27. DiGia was assigned responsibility for overseeing the financial management of Da Silva's operation. Throughout her tenure, she identified and raised concerns regarding significant discrepancies between her own financial assessments and those of DiGia and Caprio. Despite these concerns, Da Silva was consistently portrayed as incompetent.

28. DiGia also harshly rebuked Da Silva for late responses when he sent out materials for meetings at the last minute, thereby preventing Da Silva from reviewing them on time. Da Silva's diagnosed attention deficit disorder ("ADHD") also prevented her from reviewing materials sent close to the beginning of scheduled meetings.

29. Da Silva reported to ABFS's human resources manager Victoria Guerrera in or about March and August of 2023 that DiGia was treating Da Silva in a harsh and demeaning manner due to her gender.

30. Guerrera admitted to Da Silva that ABFS's work environment was deferential to

men, even when they behaved in a discriminatory manner to women. Guerrera further commiserated with Da Silva, lamenting that women were not respected within ABFS. ABFS did not take any action to change DiGia's behavior despite Da Silva's reports to Guerrera, a fellow female employee who had, herself, experienced similar treatment..

31. Da Silva submitted a reasonable accommodation request to ABFS regarding her ADHD on September 12, 2023, asking that ABFS accommodate her ADHD disability by issuing materials for scheduled meetings 48 hours in advance. However, ABFS failed and/or refused to respond to this request, thereby failing and/or refusing to engage in the VHRA's required interactive process.

32. Quigley became Da Silva's direct supervisor again in or about January 2024, and Da Silva and Ferrara collaborated more closely in their work in 2024, and Da Silva witnessed Ferrara making sexual and objectifying comments about women.

33. For example, Ferrara frequently would tell Da Silva at industry events whether he would sleep with the women around him or not and would tell stories about the various affairs he claimed to have had with women in the industry, going into intimate detail and using lewd language despite Da Silva's visible discomfort.

34. David Ferrara is married.

35. On another occasion, in or about February 2024 Ferrara groped a female police officer and harassed her until she threatened to arrest him while Da Silva and David Ferrara attended an ABFS leadership retreat in New York. ABFS leaders such as Quigley witnessed this. Caprio was made aware of this incident during a leadership dinner later that evening by which Ferrara's improprieties were made a topic of discussion.

36. On another occasion, David Ferrara locked himself and a female employee of an

ABFS competitor in a hotel room at an industry event in or about December 14, 2023 and Ferrara refused to open the door for several minutes until the female employee left through another door. Several clients and industry partners witnessed this incident.

37. ABFS leadership, including Quigley and Caprio, failed and/or refused to hold Ferrara accountable despite witnessing the foregoing behavior.

38. Da Silva witnessed Ferrara's frequent harassment of women to the point that Da Silva intentionally attempted to prevent Ferrara from working with female ABFS clients to protect the women and ABFS's interests. Da Silva also informed Guerrera and human resources more broadly of Ferrara's behavior.

39. Da Silva attended a fundraiser in or about May of 2024 that was sponsored by the National Association of Power Engineers Educational Foundation (NAPE), an organization that supports engineers and teaches courses to new engineers. During the fundraiser, NAPE director Ellen Dargenzio and Da Silva discussed how while Ferrara was the chief executive officer of NAPE, he had a sexual relationship with a 19-year-old student taking classes at NAPE and shared a sexual video recording of her with NAPE employees. The student subsequently became suicidal and filed a complaint, and NAPE ordered Ferrara to stay away from the student. Da Silva met the student at that same event that same day, and the student confirmed the foregoing account of Ferrara's behavior.

40. Ferrara contacted Dargenzio soon after and asked her what Da Silva knew about his conduct at NAPE.

41. As an advocate for advancing women in business and fostering inclusive professional environments, Da Silva serves as co-chair of CREW D.C., an organization empowering women in the commercial real estate industry. ABFS was a Gold Sponsor of CREW

D.C., aligning itself publicly with the cause of gender equity.

42. Ferrara's foregoing conduct not only undermined Da Silva's ability to effectively network and develop business relationships but insulted the mission Da Silva championed as well as the values ABFS claimed to support.

43. DiGia, a key player in determining Da Silva's performance evaluations and salary increases, did not have access to Da Silva's SAGE Accounting Software, a critical tool necessary for accurate financial analysis. This fact was disclosed during a team phone call made on or about April 16, 2024, involving Caprio, Digia, Mike Melia, Chief Financial Officer, and Mark Quigley. During this meeting, Caprio admitted that he was unaware of Digia's lack of access to this system. DiGia had been overseeing the financial management of Da Silva's operation without access to this pertinent system.

44. Further, Da Silva learned on May 9, 2024, that Ferrara had used ABFS funds to purchase equipment for his own side-business, and also learned of potential clients and contracts through ABFS but would undertake such opportunities using his own business instead.

45. Da Silva had learned about the foregoing unlawful activity by Ferrara through his direct report, William Tucker, at a leadership conference on May 9, 2024. Ferrara had told Tucker to engage in this unlawful activity for the benefit of Ferrara's side business. Christopher Van Daley, Director of Business Development at ABFS' New Jersey office, confirmed to Da Silva that Caprio knew about this unlawful activity and yet failed to address it.

46. On May 9, 2024, during the same leadership conference, DiGia publicly accused Da Silva of failing to log bids in Zoho, a system used for business development tracking. This was a false allegation which can be verified by Van Daley.

47. On May 10, 2024, Da Silva reported Ferrara's potential embezzlement to Quigley.

Quigley immediately told Ferrara about Da Silva's disclosure.

48. Thereafter, Ferrara began to harass Da Silva.

49. For example, Da Silva hosted a retreat at ABFS's DC office on or about May 8 to 10, 2024, which was immediately following the NAPE fundraiser. Ferrara falsely accused Da Silva at the retreat of failing to close a deal with a potential client when Da Silva had in fact referred the client to Ferrara. Da Silva disclosed the foregoing to Caprio and accused David Ferrara of twisting the facts to harm her career. Ferrara subsequently informed Da Silva that he was leaving ABFS to work for a competitor.

50. Ferrara was further incentivized to undermine and harass Da Silva when he learned from Quigley that Da Silva had reported to him on June 13, 2024, that she knew that he had avoided paying traffic fines issued to ABFS employees and vehicles to the Commonwealth of Virginia for long enough that the fines accrued interest and went to collections.

51. In late June 2024, a domestic incident occurred between Ms. Da Silva and her then-husband. Although Ms. Da Silva was the one who was assaulted during the altercation, she was arrested on or about June 26, 2024, following being falsely accused of attacking him.

52. Da Silva asked her brother to inform Caprio that she would miss several days of work, and Caprio granted Da Silva leave because he had been aware of Da Silva's husband's previous abuse.

53. DiGia was granted access to the SAGE Accounting Software system in or about June 2024. Despite lacking essential financial records, DiGia had previously made determinations that directly impacted Da Silva's professional standing.

54. Caprio informed Marty Foldes, ABFS's director of risk management, about the arrest and the approved leave, and Foldes then joked about Da Silva's arrest in front of Ferrara.

55. Ferrara subsequently sought out Da Silva's arrest record and mugshot and showed them to ABFS staff during Da Silva's leave with intent to harm Da Silva and cause her to experience severe emotional distress.

56. Ferrara also spread explicitly false information about Da Silva with the same intent, suggesting that Da Silva:

(a) had been before a grand jury,

(b) was convicted of a felony by a jury,

(c) was going to be incarcerated for attacking her husband.

57. None of the foregoing facts are true – Da Silva was merely arrested via false accusations by her abusive and violent husband and then exonerated when the false nature of the accusations became apparent.

58. Ferrara published the foregoing false statements concerning Da Silva to other employees in ABFS with malice because: (1) Ferrara knew the statements was false or made it with reckless disregard of whether it was false or not; (2) Ferrara made the statements in such a way that it was heard by persons having no interest or duty in the subject of the statement; (3) used more violent language than necessary; and (4) Ferrara made the statement because of hatred, ill will, or a desire to hurt the Da Silva because she had reported his lewd and unlawful activity to ABFS.

59. Further, Ferrara published this defamatory information which eventually reached third parties, such as Dargenzio, who is not an ABFS employee.

60. Dargenzio obtained information that showed Ferrara stating, "Rocio went before a grand jury," "she is guilty," and "she is going to jail." None of Ferrara's statements were true, apart from the inference of Da Silva's arrest.

61. Ferrara also contacted Wesly Liu, a property manager who was acquainted with Da Silva and Ferrara through commercial real estate events, indicating that, "[Rocio] might be in jail for stabbing her husband."

62. On or about June 30, 2024, Da Silva requested a new work laptop from ABFS, as her current work laptop was in her abusive husband's possession. However, ABFS did not respond.

63. On or about July 1, 2024, Da Silva advised Guerrero that she was ready to return to work. ABFS released a new involuntary separation policy that same day.

64. On or about July 5, 2024, Quigley and Guerrero advised Da Silva that ABFS was giving her two weeks of paid leave "as you have much your plate."

65. On or about July 22, 2024, ABFS gave Da Silva permission to begin working again, and she initially worked from home and scheduled her first in-person meeting with her three direct reports for July 31, 2024.

66. On or about July 31, 2024, Da Silva entered her office and found Ferrara sitting at her desk, and when Da Silva asked him to leave so that she could meet with her direct reports Ferrara replied, "Well you're not going to need [your office] for very long since you're going away for five to twenty years."

67. Quigley subsequently entered Da Silva's office, and when Da Silva asked Quigley how Ferrara had learned about her arrest, Quigley ignored her question and told her to leave her own office and meet with her staff on a separate floor.

68. Da Silva subsequently sought out Quigley and gave him more context about David Ferrara having spread information about her arrest throughout ABFS. She also reported David Ferrara's sexual misconduct at industry events and partners and how he made Da Silva

and other female staff at ABFS uncomfortable. Quigley responded by laughing and saying, "I've heard stuff about him but…" and "you start to find these things out when they are leaving…"

69. Da Silva emailed Guerrero, Caprio, Quigley, and Foldes that same day and asked how Ferrara learned about her arrest through ABFS, but they failed and/or refused to respond.

70. On or about August 1, 2024, David Ferrara texted Da Silva a photo of her mugshot along with the following message: "If you ever reach out to my family, this will be posted all over social media and I will personally make sure anyone who knows you will have access to all 221 pounds of this. Don't ever fucking threaten me, not to me or anyone else." Ferrara negatively referred to the weight listed in Da Silva's arrest information and threatened to further spread Da Silva's arrest and mugshot.

71. Da Silva had not threatened Ferrara; she merely told him that his actions were unlawful defamation.

72. In undermining Da Silva's personal and professional reputation by casting her as a criminal who cannot perform her work to individuals within ABFS and third parties, and by violently threatening further public disclosure of false and misleading information, Ferrara intended to and succeeded in causing Da Silva severe emotional distress.

73. Da Silva immediately forwarded Ferrara's threat to Caprio, Guerrero, Quigley, and Foldes and told them that Ferrara had threatened her, but they failed and/or refused to respond.

74. On or about August 6, 2024, ABFS terminated Da Silva's employment. Ferrara later called Dargenzio to gleefully inform her that he had gotten Da Silva fired, further demonstrating his intent to cause Da Silva severe emotional distress.

75. On August 14, 2024, all criminal charges against Da Silva were dismissed.

76. On or around January 13, 2025, Da Silva began a new position as Director of Business Development for ServPro.

77. Da Silva's current position requires her to have incidental contacts with ABFS clients through industry events and NAPE, as her current employer is in the same industry as ABFS, though not a direct competitor.

78. On or about February 6, 2025, Da Silva met with Dargenzio and Jason Trotman, board member of NAPE, for networking purposes.

79. On or about February 7, 2025, Dargenzio informed Da Silva that Ferrara, also a board member of NAPE, called Trotman earlier that morning and asked him, "why are you out with that bitch, I got her fired and she is suing ABFS."

80. As the result of ABFS and Ferrara's illegal actions, Da Silva sustained economic damages from loss of her position, as well as compensatory damages due to severe emotional distress, loss of enjoyment of position and life, and harm to both her professional and personal reputations, and she will continue to sustain damages into the future.

81. Da Silva's severe emotional distress from Defendant's actions includes fear for her personal safety, physical injury resulting in loss of appetite, nausea, numbness in her hands, neck and shoulder strain. Da Silva has been forced to seek medical attention due to the physical and mental injury resulting from Defendants' actions, including visits to her therapist and her personal physician as well as additional medication to manage her worsening physical and mental symptoms.

82. Da Silva has sought to mitigate her damages by seeking and securing employment in the same industry. However, doing so has put her in contact with associates of Caprio, Ferrara, and ABFS, triggering further physical and mental injuries due to her trauma response. Da Silva

has further faced questions from colleagues in the industry about Ferrara's claims and about her termination, showing the impact Defendants have had on Da Silva's career and professional reputation.

**COUNT I**
**Virginia Human Rights Act**
**Va. Code Ann. § 2.2-3900 *et seq.***
**Discrimination Based on Sex**
**Against ABFS**

83. Da Silva incorporates the allegations in the foregoing paragraphs as though fully alleged herein.

84. Da Silva is an "employee" as defined in Va. Code. Ann. § 2.2-3905.

85. ABFS is an "employer" as defined in Va. Code. Ann. § 2.2-390.

86. Da Silva is female, and therefore Da Silva is a member of a protected class under the VHRA.

87. ABFS violated § 2.2-3900 *et seq*. by unlawfully discriminating against Da Silva based on her sex.

88. Da Silva suffered adverse employment actions as a result of ABFS's unlawful discrimination.

89. ABFS's actions raise an inference of discrimination, as it did not subject male employees to the same treatment.

90. ABFS's stated and forthcoming reasons for its adverse employment actions against Da Silva are pretext for unlawful discrimination.

91. Da Silva suffered damages because of ABFS's unlawful discrimination of Da Silva.

92. As a direct, foreseeable and proximate result of ABFS's conduct, Da Silva sustained and continues to sustain substantial losses in earnings, employment benefits,

employment opportunities, and other economic losses in an amount to be determined at time of trial. Da Silva has sought to mitigate these damages.

93. For ABFS's unlawful discrimination against Da Silva, he is entitled to such legal or equitable relief as will effectuate the purposes of the VHRA, including, but not limited to, reasonable attorneys' fees, compensatory damages, punitive damages, damages for humiliation and embarrassment, front and back pay, interest on all damages, equitable relief, consequential damages, any other relief that furthers the purpose of the VHRA, and any other relief that this Court deems just and equitable.

**<u>COUNT II</u>**
**Virginia Human Rights Act**
**Va. Code Ann. § 2.2-3900 *et seq.***
**Hostile Work Environment**
**Against ABFS**

94. Da Silva hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

95. Da Silva is a member of protected classes because she is female.

96. Da Silva is an "employee" as defined in Va. Code. Ann. § 2.2-3905.

97. ABFS is an "employer" as defined in Va. Code. Ann. § 2.2-3905.

98. ABFS subjected Da Silva to frequent and unwelcome verbal and non-verbal harassment because of her membership in a protected class.

99. ABFS's harassment affected the terms of conditions of Da Silva's employment, had the purpose and effect of unreasonably interfering with the work environment, and created an intimidating, hostile, and offensive work environment.

100. ABFS knew or actively engaged in the harassment of Da Silva and failed to act to prevent it.

101. ABFS violated § 2.2-3900 *et seq*. by paying her less than her equivalent male peers, allowing David Ferrara to harass and threaten her, spreading information about her arrest to ABFS employees and David Ferrara, and ultimately by terminating her.

102. Da Silva sustained substantial monetary and non-monetary damages as the result of ABFS's illegal conduct.

**COUNT III**
**Virginia Human Rights Act**
**Va. Code Ann. § 2.2-3900 *et seq.***
**Failure to Accommodate**
**Against ABFS**

103. Da Silva hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

104. Da Silva is an employee as defined in Va. Code. Ann. § 2.2-3905.

105. Defendant is an employer as defined in Va. Code. Ann. § 2.2-3905.

106. Da Silva is a member of a protected class as an employee with a disability under the VHRA.

107. Da Silva could perform the essential functions of her position with a reasonable accommodation.

108. ABFS violated § 2.2-3900 *et seq*. by failing to accommodate Da Silva's disability.

109. ABFS was aware of Da Silva's disability but failed to offer reasonable accommodation to Da Silva.

110. ABFS discriminated against Da Silva by first failing to engage in an interactive process in assisting Da Silva with obtaining reasonable accommodation, with which Da Silva could perform the essential functions of her position and thereafter failing to provide Da Silva with the reasonable accommodations she had requested.

111. ABFS discriminated against Da Silva based on her disability by failing to show that accommodating Da Silva was an undue burden.

112. Da Silva has suffered substantial economic and mental anguish damages as a result of ABFS's unlawful actions, and she will continue to sustain damages into the future.

113. For ABFS's unlawful discrimination against Da Silva, she is entitled to such legal or equitable relief as will effectuate the purposes of the VHRA, including, but not limited to, reasonable attorneys' fees, compensatory damages, punitive damages, front and back pay, interest on all damages, reinstatement, consequential damages, any other relief that furthers the purpose of the VHRA, and any other relief that this Court deems just and equitable._

**COUNT IV**
**Virginia Human Rights Act**
**Va. Code Ann. § 2.2-3900 *et seq.***
**Retaliation**

114. Da Silva incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

115. Va. Code Ann. § 2.2-3900 *et seq*. was in full force and effect at all relevant times.

116. Da Silva was an "employee" as defined by Va. Code. Ann. § 2.2-3905.

117. ABFS is an "employer" as defined by Va. Code. Ann. § 2.2-3905.

118. Da Silva engaged in protected activity under § 2.2-3900 *et seq.* when:

(a) She informed Victoria Guerrera of sex discrimination on DiGia's part throughout 2023,

(b) She informed Quigley of David Ferrara's sex discrimination on July 31, 2024,

(c) She emailed multiple managers at ABFS on July 31, 2024, and August 1, 2024, regarding David Ferrara's discriminatory behavior and animus.

119. ABFS took a materially adverse action against Da Silva because of her protected

activity when it allowed David Ferrara to harass Da Silva, accused her of misconduct, and subsequently fired her.

120. ABFS's stated and forthcoming reasons for terminating Da Silva are pretextual.

121. As a direct, foreseeable, and proximate result of ABFS conduct, Da Silva sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and other economic losses in an amount to be determined at time of trial. Da Silva has sought to mitigate the foregoing damages.

122. For ABFS's unlawful retaliation against Da Silva, she is entitled to such legal or equitable relief as will effectuate the purposes of the VHRA, including, but not limited to, reasonable attorneys' fees, compensatory damages, punitive damages, damages for humiliation and embarrassment, front and back pay, interest on all damages, equitable relief, consequential damages, any other relief that furthers the purpose of the VHRA, and any other relief that this Court deems just and equitable.

## COUNT V
**Intentional Infliction of Emotional Distress**
**Against all Defendants, Jointly and Severally**

123. Da Silva incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

124. Ferrara intentionally or recklessly acted toward Da Silva in a manner that caused her severe emotional distress.

125. Ferrara's conduct was outrageous in character, beyond all possible bounds of decency. *See Doe by and Through Doe v. Baker*, 857 S.E. 2d 573, 589 (Va. 2021).

126. Ferrara engaged in outrageous conduct when he learned of Da Silva's arrest and spread information about her arrest across ABFS, implying that she was guilty, had been interviewed by a grand jury, and was going to prison.

127. In addition, Ferrara attempted to undermine Da Silva's reputation in the workplace by creating a false narrative about her performance, claimed to have gotten her fired from ABFS, and threatened her with further defamation regarding her arrest upon her reasonably discussing this current legal action against him.

128. Although Ms. Da Silva has secured a new position within the same industry, her ability to generate sales and advance professionally continues to be impaired due to reputational harm caused by Mr. Caprio and Mr. Ferrara. Their influence has led to ongoing blacklisting, resulting in lost opportunities.

129. Ferrara's conduct was intentional or reckless.

130. Da Silva suffered severe emotional distress manifesting in physical and mental injury for which she has needed to seek and pay for additional medical treatment, all causing a disintegration of Da Silva's daily life.

131. Ferrara's conduct caused Da Silva's severe emotional distress.

132. Ferrara acted within the scope of his employment with ABFS when he recklessly or intentionally initiated the foregoing outrageous conduct that caused Da Silva's severe emotional distress by initiating the foregoing conduct, in part, using ABFS's instrumentalities, and operating through privileges conveyed by having positions within ABFS.

133. ABFS is therefore liable to Da Silva for Ferrara's actions.

134. As a result of the Defendants' illegal actions, Da Silva sustained severe emotional distress, loss of professional or personal reputation, and loss of enjoyment of work or life.

**COUNT VI**
**Negligent Retention**
**Against ABFS**

135. Da Silva incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

136. ABFS was Da Silva's and Ferrara's "employer" under Virginia common law, as it controlled and directed the means and manner of their performance at ABFS.

137. Ferrara had known propensities, or propensities which should have been discovered by reasonable investigation to engage in sexual harassment.

138. Da Silva reported Ferrara's behavior to human resources and ABFS leadership several times, but ABFS never acted against Ferrera. Although Ferrera left, it was of his own accord. In fact, Ferrara stayed longer than his initial departure date as a contractor.

139. ABFS knew or should have known that Ferrara posed a threat of injury to others including Da Silva.

140. ABFS negligently failed to remove Ferrara, thus allowing him to harm Da Silva through his retention by ABFS.

141. Ferrara harmed Da Silva with conduct that encompassed (1) discussing his affairs with various women in the industry in extensive detail to Da Silva, (2) discussing which women in the industry he would have sex with, (3) sexually harassing women in front of or around Da Silva, (4) undermining Da Silva's reputation at ABFS by lying about her performance on the job, (5) maliciously spreading false information within ABFS about Da Silva's arrest, (6) threatening to further maliciously spread information about Da Silva's arrest in response to her discussing the current legal action, and (7) based on his own statements, having contributed to ABFS's decision to fire Da Silva.

142. Da Silva reported Ferrara's conduct multiple times before it escalated to his defamatory statements and severely distressing threats. Da Silva presented ABFS with multiple opportunities to address Ferrara's behavior. Multiple women in the same industry as ABFS, including Dargenzio, knew that Ferrara was dangerous. Caprio and Quigley personally witnessed Ferrara's sexually harassing behavior. ABFS therefore knew that Ferrara was dangerous.

143. As a result of ABFS's negligent conduct, Da Silva sustained a loss of her income at ABFS, severe emotional distress, loss of professional or personal reputation, and loss of enjoyment of work or life.

**COUNT VII**
**Negligent Hiring**
**Against ABFS**

144. Da Silva incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

145. ABFS was Da Silva's and Ferrara's "employer" under Virginia common law, as it controlled and directed the means and manner of their performance at ABFS.

146. Ferrara had known propensities, or propensities which should have been discovered by reasonable investigation to engage in sexual harassment.

147. Da Silva reported concerns regarding Ferrara before ABFS hired Ferrara, including his attitude towards women and his failure to be hired at a competitor due to failing a background check.

148. ABFS knew or should have known that Ferrara posed a threat of injury to others including Da Silva.

149. ABFS negligently hired Ferrara, thus allowing him to harm Da Silva.

150. Ferrara harmed Da Silva with conduct that encompassed (1) discussing his affairs

with various women in the industry in extensive detail to Da Silva, (2) discussing which women in the industry he would have sex with, (3) sexually harassing women in front of or around Da Silva, (4) undermining Da Silva's reputation at ABFS by lying about her performance on the job, (5) maliciously spreading false information within ABFS about Da Silva's arrest, (6) threatening to further maliciously spread information about Da Silva's arrest in response to her discussing the current legal action, and (7) based on his own statements, having contributed to ABFS's decision to fire Da Silva.

151. Multiple women in the same industry as ABFS, including Dargenzio, knew that Ferrara was dangerous.

152. ABFS therefore knew or should have known that Ferrara was dangerous before it hired him.

153. As a result of ABFS's negligent conduct, Da Silva sustained a loss of her income at ABFS, severe emotional distress, loss of professional or personal reputation, and loss of enjoyment of work or life.

**<u>COUNT VIII</u>**
**Virginia Whistleblower Protection Law**
**Va. Code § 40.1-27.3**
**Retaliation**
**Against ABFS**

154. Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

155. At all relevant times herein, Va. Code § 40.1-27.3 was in full force and effect.

156. Plaintiff was an "employee" as defined by Va. Code. Ann. § 40.1.

157. ABFS is an employer, and Plaintiff engaged in protected activity when she reported in good faith that Ferrara was embezzling funds and allowing traffic citations against

ABFS to go unpaid.

158. ABFS unlawfully retaliated against Plaintiff when it terminated Plaintiff's employment in the weeks following Plaintiff's protected activity.

159. The reasons ABFS provides for its actions against Plaintiff are false. ABFS in fact terminated Plaintiff because of her protected activity.

160. Plaintiff suffered substantial economic damages as a result of ABFS's unlawful actions, and she will continue to sustain damages into the future.

161. For ABFS's unlawful retaliation against Plaintiff, she is entitled to such legal or equitable relief as will effectuate the purposes of the VWPL, including, but not limited to, reasonable attorneys' fees and costs, front and back pay, interest on all damages, equitable relief, consequential damages, any other relief that furthers the purpose of the VWPL, and any other relief that this Court deems just and equitable.

**COUNT IX**
**Common Law Wrongful Termination of Employment**
**For Opposing or Resisting Criminal Conduct**
**Against all Defendants, Jointly and Severally**

162. Plaintiff incorporates the allegations in the foregoing paragraphs as though alleged herein.

163. Defendant Ferrara refused to pay ABFS's employees' speeding tickets, embezzled funds, and improperly directed clients away from ABFS.

164. Plaintiff opposed Defendant Ferrara's practices by reporting them to their supervisor, Mr. Quigley on multiple occasions.

165. However, ABFS took no action to stop Defendant Ferrara's behavior and instead terminated Plaintiff's employment. In fact, ABFS immediately informed Defendant Ferrara of Plaintiff's opposition to his practices.

166. Defendant Ferrara claims to have gotten Plaintiff fired.

167. Va. Code § 18.2-111 and § 18.2-113 cover the conduct that Ferrara violated when making purchases for himself using ABFS funds.

168. ABFS's termination of Plaintiff violated the established public policies against termination of employees who oppose unlawful conduct by their employers or supervisory officials or agents of their employees. Defendant Ferrara's participation in ABFS's termination of Plaintiff renders him liable as well.

169. Plaintiff's termination violated the public policy underlying the regulations and statutes of the Commonwealth of Virginia which prescribe rules to protect the public from embezzlement.

170. Plaintiff's termination, and the events leading up to that termination, violated public policy; evidenced malice, spite, and ill will; was willful and wanton; and evinced a conscious disregard for Plaintiff's rights.

171. As a direct and proximate cause of ABFS and Ferrara's actions under Va. Code § 18.2-111 and § 18.2-113, Plaintiff has suffered and continues to suffer injury, emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

172. Due to the severity of ABFS and Ferrara's actions, Plaintiff is also entitled to punitive damages.

**<u>COUNT X</u>**
**Common Law Defamation *Per Se***
**Against Ferrara**

173. Plaintiff incorporates the allegations in the foregoing paragraphs as though

alleged herein.

174. Defamation in Virginia occurs upon the: (1) publication of (2) an actional statement (3) of or concerning the plaintiff with (4) the requisite intent.

175. Although intra-corporate statements are generally immune from liability in a defamation action, this privilege can be defeated by a showing of malice by clear and convincing evidence. *See Isle of Wight County v. Nogiec,* 281 Va. 140, 152 (2011).

176. Malice is shown by "(1) defendant knew the statement was false or made it with reckless disregard of whether it was false or not; or (2) the statement was deliberately made in such a way that it was heard by persons having no interest or duty in the subject of the statement; or (3) the statement was unnecessarily insulting; or (4) the language used was stronger or more violent than was necessary under the circumstances; or (5) the statement was made because of hatred, ill will, or a desire to hurt the plaintiff rather than as a fair comment on the subject; or (6) the statement was made because of personal spite, or ill will, independent of the occasion on which the communication was made." *Id.*

177. Ferrara knowingly and maliciously published false statements about Da Silva, claiming that, "Rocio went before a grand jury," "she is guilty," "she is going to jail" and she "stabbed her husband." None of Ferrara's statements were true, apart from the inference of Da Silva's arrest. Ferrara's statements were of and concerning Da Silva. Moreover, Ferrara intended to refer to Da Silva in making these statements, and those who know Da Silva or heard these statements understood these statements to be about Da Silva.

178. These statements, which claim Da Silva "went before a grand jury," "is guilty," and "is going to jail," are false. Da Silva was arrested but was fully exonerated shortly thereafter.

179. Ferrara knowingly and maliciously, verbalized that he "got [Da Silva] fired" and

continues to malign her reputation by making derogatory, rhetorical inquiries to mutual contacts, such as, "why are you out with that bitch?"

180. The substantial danger of injury to Da Silva's reputation from Ferrara's false statements is readily apparent. Such statements harm Da Silva's reputation in the community and deter third parties from associating with her.

181. By publishing these false statements, Ferrara caused harm to Da Silva's reputation.

182. At the time of publication, Ferrara knew these statements were false, satisfying the first possible definition of malice from *Isle of Wight*.

183. The defamatory language used by Ferrara was stronger and more violent than was necessary under the circumstances as Da Silva was arrested but exonerated soon after. Without an inference of malice, it is hard to fathom how Ferrara could glean guilt, incarceration, and a discussion with a grand jury from a mere arrest that resulted in no conviction. This satisfies the fourth possible definition of malice from *Isle of Wight*.

184. The defamatory language used by Ferrara was made because of hatred, ill will, or a desire to hurt Da Silva rather than as a fair comment on the subject; and because of personal spite, or ill will, independent of the occasion on which the communication was made. Ferrara was angry and resentful that Da Silva had learned of Ferrara's sexually harassing behavior and other unlawful activity and that she had reported it to ABFS. This motivated Ferrara to make his malicious defamatory statements and satisfy the sixth possible definition of malice from *Isle of Wight*.

185. Ferrara's statements are defamatory *per se* because they contain false factual assertions about Da Silva and a crime of moral turpitude on her part, harming De Silva's

professional reputation. Plaintiff is therefore entitled to presumed damages.

186. As direct and proximate result of these false statements by Ferrara, Plaintiff has suffered damages, including, *inter alia*, injury to her reputation, harm to her ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

187. Even if Ferrara's statements are not defamatory *per se*, Da Silva can demonstrate reputational harm as a result of the false inferences and falsehoods within the statements.

188. Further, the statements were made purposefully by Ferrara, and no applicable privilege or defense applies on Ferrara's part.

189. Ferrara's actions were malicious, willful, and wanton, and evidence of a conscious disregard for Da Silva's rights. Accordingly, punitive damages are appropriate.

190. For Ferrara's unlawful defamation *per se* against Da Silva, Da Silva is entitled to damages for lost compensation, emotional harm, and reputational damages.

## PRAYER FOR RELIEF

Plaintiff Rocio Da Silva requests the following relief:

A. Judgment against Defendants, jointly and severally, in the amount of economic damages, compensatory damages, liquidated damages, and punitive damages to be determined at trial;

B. Pre-judgment interest;

C. Employment, reinstatement, promotion, or other equitable relief;

D. Economic damages including front and back pay;

E. Compensatory damages;

F. Interest due on unpaid wages;

G. Reasonable attorneys' fee and the costs of this action, and;

H. Any other relief this Honorable Court deems just and proper to award.

## AD DAMNUM CLAUSE

Da Silva is seeking damages in an amount in excess of $1,000,000.00.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

Rocio Da Silva
4920 Pebble Run Rd.
Warrenton, VA 20187
(571)289-0360
iknowrocio@gmail.com
*Plaintiff, Pro Se*

Print | Highlight Fields | Clear All Data

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. CL25-6738 (CLERK'S OFFICE USE ONLY)

Norfolk City Circuit Court

Rocio Da Silva v./In re: David Ferrara
PLAINTIFF(S) DEFENDANT(S)

AD Facility Services LLC

I, the undersigned [✓] plaintiff [ ] defendant [ ] attorney for [ ] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [✓] Claim Impleading Third Party Defendant
  - [✓] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

## ADMINISTRATIVE LAW
- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY
- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS
- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS
- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
- [ ] Trust (select one)
  - [ ] Impress/Declare
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of U.S. Currency
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify) ........................

[✓] Damages in the amount of $ 1,000,000.00 are claimed.

8/4/25
DATE

[✓] PLAINTIFF [ ] DEFENDANT [ ] ATTORNEY FOR [ ] PLAINTIFF [ ] DEFENDANT

Rocio Da Silva
PRINT NAME

4920 Pebble Run Rd. Warrenton VA 20187
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

571 289 0360

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.



Print

## Civil Action Type Codes
## (Clerk's Office Use Only)

Accounting ACCT
Adoption ADOP
Adoption – Foreign FORA
Adult Protection PROT
Aid and Guidance AID
Annexation ANEX
Annulment ANUL
Annulment – Counterclaim/Responsive Pleading ACRP
Appeal/Judicial Review
- ABC Board ABC
- Board of Zoning ZONE
- Compensation Board ACOM
- DMV License Suspension JR
- Employment Commission EMP
- Employment Grievance Decision GRV
- Local Government GOVT
- Marine Resources MAR
- School Board JR
- Voter Registration AVOT
- Other Administrative Appeal AAPL

Appointment
- Conservator of Peace COP
- Church Trustee AOCT
- Guardian/Conservator APPT
- Marriage Celebrant ROMC
- Standby Guardian/Conservator STND

Asbestos Litigation AL
Attachment ATT
Bond Forfeiture Appeal BFA
Child Abuse and Neglect – Unfounded Complaint CAN
Civil Contempt CCON
Claim Impleading Third Party Defendant – Monetary Damages/No Monetary Damages CTP
Complaint – (Miscellaneous) COM
Compromise Settlement COMP
Condemnation COND
Confessed Judgment CJ
Contract Action CNTR
Contract Specific Performance PERF
Counterclaim – Monetary Damages/No Monetary Damages CC
Cross Claim CROS
Declaratory Judgment DECL
Declare Death DDTH
Detinue DET
Divorce
- Complaint – Contested/Uncontested DIV
- Counterclaim/Responsive Pleading DCRP
- Reinstatement – Custody/Visitation/Support/ Equitable Distribution CVS

Driving Privileges
- Reinstatement pursuant to § 46.2-427 DRIV
- Restoration – Habitual Offender or 3rd Offense REST

Ejectment EJET
Encumber/Sell Real Estate RE
Enforce Vendor's Lien VEND
Escheatment ESC
Establish Boundaries ESTB
Expungement XPUN
Forfeiture of U.S. Currency FORF
Freedom of Information FOI
Garnishment GARN
Injunction INJ
Intentional Tort ITOR
Interdiction INTD
Interpleader INTP
Interrogatory INTR
Judgment Lien – Bill to Enforce LIEN
Landlord/Tenant LT
Law Enforcement/Public Official Petition LEP
Mechanics Lien MECH
Medical Malpractice MED
Motor Vehicle Tort MV
Name Change NC
Other General Tort Liability GTOR
Partition PART
Petition – (Miscellaneous) PET
Product Liability PROD
Quiet Title QT
Referendum Elections ELEC
Reinstatement (Other than divorce or driving privileges) REIN
Removal of Case to Federal Court REM
Restore Firearms Rights – Felony RFRF
Restore Firearms Rights – Review RFRR
Separate Maintenance SEP
Separate Maintenance – Counterclaim/Responsive Pleading SCRP
Sever Order SEVR
Taxes
- Correct Erroneous State/Local CTAX
- Delinquent DTAX

Termination of Mineral Rights MIN
Trust – Impress/Declare TRST
Trust – Reformation REFT
Unlawful Detainer UD
Vehicle Confiscation VEH
Voting Rights – Restoration VOTE
Will Construction CNST
Will Contested WILL
Writs
- Certiorari WC
- Habeas Corpus WHC
- Mandamus WM
- Prohibition WP
- Quo Warranto WQW

Wrongful Death WD